IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 14, 2017

## DEON LAMONT CARTMELL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1351    J. Randall Wyatt, Jr., Judge**

_____

### No. M2017-00552-CCA-R3-PC

_____

The Petitioner, Deon Lamont Cartmell, was convicted of second degree murder for the killing of his wife and sentenced to eighteen years. On direct appeal, his conviction and sentence were affirmed. State v. Deon Lamont Cartmell, No. M2012-01925-CCA-R3-CD, 2014 WL 3056164, at *1 (Tenn. Crim. App. July 7, 2014), perm. app. denied (Tenn. Nov. 20, 2014). He then filed a timely petition for post-conviction relief, followed by three amended petitions, alleging ineffective assistance of counsel, prosecutorial misconduct, and cumulative error. Following a bifurcated hearing, the post-conviction court found that the Petitioner's claims were without merit, and we agree. Accordingly, we affirm the order of the post-conviction court denying relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Deon Lamont Cartmell.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy M. Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The facts in this matter were summarized in the opinion of this court on direct appeal:

This case relates to the March 16, 2010 shooting death of Shari Monique Cartmell, the [Petitioner's] wife, at the marital home. Nashville Fire Department firemen responded and found the victim lying on the couch unresponsive, not breathing, and without a pulse. She was transported to Vanderbilt Hospital.

Metro Police Crime Scene Investigator Felicia Evans performed a gunshot residue test on the [Petitioner]. At the scene, Investigator Evans found blood transfer on the doorways throughout the house, a nine-millimeter pistol and a paper towel lying on an ottoman, and a cartridge casing beside the ottoman. She said the [Petitioner] wore a dark-colored "hoodie" and jeans and had blood on his clothes, hands, and face.

Metro Police Officer Kenneth Wolfe photographed the crime scene. He identified photographs of blood on the outside door of the house, a large amount of blood on the sofa, blood on the wall to the right of the front door, blood on the inside of the front door and on the door handle, and bloody rags on the floor and on the ottoman. He also found a handgun with blood on it lying on the ottoman and a cartridge casing lying on the floor beside it. He found a trauma plate inside the house, which he said was part of a police-issued bulletproof vest. He said chicken was in the oven and in the sink defrosting. He said that a gun safe was in the master bedroom closet and that handguns, a rifle, and a police-issued shotgun were in the master bedroom.

When Metro Fire Department Captain Michael Sisk arrived at the scene, the [Petitioner] told him that he was in the kitchen when he heard the gun discharge. When the [Petitioner] went with Metro Police Chaplain James Duke to notify the victim's mother of the victim's death, the [Petitioner] told Chaplain Duke that he and the victim were at the house, that they were handling guns, and that she wanted to "dry fire" the gun. The [Petitioner] said that the victim was cooking dinner, that she put the gun down to check the oven, and that he reloaded the gun and went to the bedroom to put up another gun. He said he heard a shot when he was in the bedroom and found the victim lying on the floor when he returned. He told Chaplain Duke that he attempted CPR but was unable to save the victim.

- 2 -

Metro Police Detective Charles Robinson testified that although the call was for an accidental shooting, he questioned whether the shooting was accidental after observing the blood spatter and after hearing the [Petitioner's] statement to the police. The [Petitioner] first said the victim was in the kitchen when he reloaded the weapon but then said she was standing by the couch. The [Petitioner] had blood on his jeans, hands, and face. He was wearing a gray hoodie jacket over a white shirt when the police arrived but was not wearing the jacket at the time of the shooting. Detective Robinson saw blood on the right side of the white shirt, which concerned him because the [Petitioner] stated that the victim was on his left when he bent to get the AR-15 and heard the gun go off. Detective Robinson requested a gunshot residue test be performed on the [Petitioner] and asked him to go to the police station. The [Petitioner] was cooperative, consented to a search of the house, allowed the police to take his clothes and test his hands for gunshot residue, and went to the police station voluntarily. The [Petitioner] allowed Detective Robinson to look at the text messages stored in his cell phone, and Detective Robinson determined that some messages were from Paige Merriweather. The text messages were read to the jury with the date and time they were sent but were not transcribed for the record.

On the day after the shooting, Detective Robinson interviewed the [Petitioner] and recorded his statement, which was played for the jury. When asked about the March 16, 2010 events, the [Petitioner] first told the detective about the victim's discharging a gun accidentally a couple months before the shooting. He said that the victim was "messing around" with the gun, that a bullet was in the chamber, and that she fired it. He said the bullet went through the mattress, the footboard of the bed, and the wall and hit his "subwoofer system" before stopping. The [Petitioner] described the day of the shooting and said that he was reaching for his AR-15 and that the victim was on his left when he heard a "bang" and felt the force of the shot. He said he called 9-1-1, pressed a rag on the wound, and began CPR.

In response to Detective Robinson's question about whether the [Petitioner] and the victim were having marital problems, the [Petitioner] stated, "No, man. It was great." When asked if they argued about bills or had any recent arguments, the [Petitioner] stated, "Well, no, the only, the only problems we ever, would ever be financial. . . ." He described his relationship with the victim's family and said he had issues with her mother. He discussed his texting another woman named Paige the morning before the victim's death and said he met her when he responded to her call

to the police after she witnessed a traffic accident. When asked again if there were problems in his marriage, the [Petitioner] said, "No, the last, the last time we got into an argument . . . would have been the last time we turned the mortgage in. Once we turned the mortgage in . . . it went back to normal." He said, "But we, you know, were doing good. I mean . . . it was all happy, man. It was . . . kissing in the morning, hugs at night."

After reviewing bills and letters found in the [Petitioner's] house, Detective Robinson discovered that the couple was in poor financial condition. The [Petitioner] told the police that the argument between him and the victim that was recorded by the cameras at Skyline Medical Center on March 11, 2010, concerned money and mortgage payments. Detective Robinson reviewed the [Petitioner's] cell phone records and interviewed Megan Prisco, Cherelle Bradford, and Sabrina Silverman based on the high volume of telephone calls and text messages exchanged between them and the [Petitioner].

Skyline Medical Center surveillance camera recordings from March 16, 2010, last showed the victim at the nurses' station at 3:48 p.m. Cynthia D. Edge, the director of patient registration, saw the victim on March 16 around 4:00 p.m. in the main admission and registration area. The victim talked until 4:15 or 4:20 p.m. and went to Christine Rogers's office afterward. Ms. Rogers, the emergency room patient access supervisor, said the victim left her office at 4:32 p.m. and was going home to get ready to go out with her friend Stephanie. Steve Rogers, Ms. Rogers's husband, saw the victim outside his wife's office on March 16 at 4:30 p.m. Detective Robinson made eleven trips from Skyline Medical Center to the [Petitioner's] house using three different routes, and the shortest trip was seven minutes.

Detective Robinson testified that the time taken to drive between Skyline Medical Center and the [Petitioner's] house was important to show how long the victim was home. He said that the 9-1-1 call was received at 4:46 or 4:47 p.m. and that witness statements showed that the victim left the hospital around 4:30. He said that according to the [Petitioner's] statement, he went "from being in the bedroom shooting a gun to showing [the victim] how to actually take it apart and reassemble a gun, cooking, watching a movie, which was Training Day." Detective Robinson said that he did not see how the [Petitioner] and the victim could have accomplished everything the [Petitioner] stated when the timeline showed that the victim was only home about ten minutes before the [Petitioner] called 9-1-1.

- 4 -

Ms. Rogers testified that the victim called her one night in 2009 about 9:00 p.m. and asked for a ride from a night club because she was afraid to go home. She did not know why the victim was afraid. She said the victim told her that she and the [Petitioner] were in their apartment playing with a gun and that the [Petitioner] shot through a doorframe into another unit. She said the victim also told her that when she and the [Petitioner] were arguing about her not feeding a pet snake, the [Petitioner] discharged a gun through the bed and out the bathroom window. Ms. Rogers heard the victim tell her friends in the emergency room, though, that she discharged the gun, not the [Petitioner]. Ms. Rogers told the police that she thought the [Petitioner] and the victim were a loving couple, that she did not believe the victim was in danger, and that if the victim was in danger, the victim would have told her.

Metro Police Field Training Officer Mackovis Peebles worked with the [Petitioner] at the end of February 2010. When Officer Peebles asked the [Petitioner] if he was married, the [Petitioner] said that he was but that if he wanted to "go out and see his ho's," he would tell his wife and play mind games with her. Officer Peebles told the [Petitioner] that he should not do that to his wife because it might be construed as verbal abuse, but the [Petitioner] laughed and joked about it. Officer Peebles overheard a heated cell phone conversation between the [Petitioner] and the victim about bills.

Megan Prisco met the [Petitioner] at a gas station where she worked. They traded telephone numbers in January or February 2010 and exchanged sexual text messages, although both were married. The [Petitioner] visited Ms. Prisco when she worked on the weekends. The [Petitioner] told her that he was married to his high school sweetheart and that they had a house together. He told her the victim wanted everything "top of the line." Ms. Prisco, the [Petitioner], and the victim went to the same high school, and the [Petitioner] told Ms. Prisco that he wished he would have met her first. Ms. Prisco ended the relationship on March 7, 2010, because the [Petitioner] drove by her house in a police car after she asked him not to come to her house. She saw the [Petitioner] once after ending the relationship when he came to the gas station with another officer on March 12, 13, or 14, 2010. She said he looked stressed and told her that he was having problems at home but that "things were going to be taken care of not to worry about it."

Stephanie Lindblom was friends with the victim, worked with her at Skyline Medical Center, and had known her about two years. She said that on the Thursday before the shooting, the [Petitioner] and the victim argued at the discharge desk in the emergency room about a house payment and that the [Petitioner] wanted money from the victim. She said the [Petitioner] walked into the emergency room and stated that he wanted the "God d--- money" and was tired of playing the victim's "f games." She said the victim was embarrassed and fearful. Ms. Lindlom left to register patients during the argument and received an e-mail from the victim that said, "Don't leave me up here with this nut." After the incident, the victim told Ms. Lindblom that if the [Petitioner] wanted a divorce, "[I]t was his."

Ms. Lin[d]blom noticed the victim's wedding ring was missing in the months before her death and said that the victim was horrified that she lost the ring because she loved it. Ms. Linblom heard the victim talk about accidentally discharging a weapon at her house but said she did not believe the victim because she would not "play around" with guns and would tell the [Petitioner] to put them away.

Antoya Brandon, the victim's sister, testified that the victim and the [Petitioner] were married for three years. She said the victim was familiar with weapons and had been to a shooting range before marrying the [Petitioner]. She knew about the victim's money problems and said the victim was "always broke" and had to borrow money. She noticed the victim's wedding ring was missing in the months before her death. Ms. Brandon said that she visited the [Petitioner] and the victim's house with her two-year-old daughter, that she told the victim to ask the [Petitioner] to remove a gun that was on the ottoman, and that the [Petitioner] responded, "This is my f house and everybody can get the f--- out."

Charlotte Barbour, the victim's mother, testified that the victim's wedding ring was missing in the months before her death. She said that around Christmas 2009, she spoke with the victim about having children and that the victim told her she could not have children with the [Petitioner] because he told her that if she left him, he would kill her, the baby, and himself before he paid child support. Ms. Barbour asked the [Petitioner] if he made the statement, and the [Petitioner] walked away without responding. On the Thursday before the shooting, Ms. Barbour went to the victim's house, saw a hole in the bathroom wall, and asked what happened. The victim showed her a gunshot hole in her mattress. The victim said she

did not shoot the gun but did not answer when Ms. Barbour asked if the [Petitioner] shot it.

Ricky Iverson, a patient access manager at Skyline Medical Center, testified that the [Petitioner] called him between 7:00 and 8:00 a.m. on March 17, 2010, and asked whom to contact about life insurance. He said the [Petitioner] wanted to come to the hospital and speak to the victim's co-workers to tell them his side of the story because he claimed the victim's mother had made inaccurate statements. Corey Northern, a Metro Human Resources analyst, testified that the [Petitioner] called him on March 17, 2010, at about 9:30 a.m. to ask about life insurance for the victim and that although the [Petitioner] could have applied for insurance on his wife, he had not.

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Robert Miles, an expert in gunshot residue, testified that the paper towel found at the crime scene tested positive for a large amount of gunshot residue, which meant it was near a gun when the gun was fired or had come in contact with a recently fired gun. The front of the [Petitioner's] white shirt tested positive for gunshot residue on the right and left sides. The [Petitioner's] jeans tested positive for gunshot residue on the right front pocket. Agent Miles said that gunshot residue could be from shooting a gun or from transfer, that a paper towel used to clean a gun could contain gunshot residue, and that a person cleaning a weapon could have gunshot residue on his shirt and pants.

TBI Special Agent Forensic Scientist Laura Hodge, an expert in gunshot residue analysis, testified that the gunshot residue test performed on the [Petitioner] was inconclusive. She said the victim's gunshot residue test results did not show elements indicative of gunshot residue.

TBI Special Agent Forensic Scientist Terri Arney, an expert in firearms identification, testified that testing could not conclusively determine whether the bullet received from the medical examiner was fired from the Glock handgun found at the crime scene but that the bullet was the same caliber and had the same features he expected to find on a bullet fired from a Glock handgun. He said the cartridge found in the living room was fired from the Glock handgun. He said the bullet and shell casing were both from a nine-millimeter. He said that all the safety features were operating on the Glock handgun found at the scene, that the gun was designed not to

fire if dropped or struck, and that the trigger had to be pulled fully to fire, which took six and seven-eighths pounds of pressure.

TBI Special Agent Charles Hardy, an expert in DNA analysis, testified that the swabs taken from the wall, door, hall, and floor indicated blood. The swabs taken from the inside of the gun barrel did not show blood, and although a limited amount of human DNA was found inside the barrel, he was unable to obtain a DNA profile from it. The blood on the wall, floor, front door, hall, paper towel, and the [Petitioner's] shirt matched the victim's DNA.

Dr. John Davis, a forensic pathologist and medical examiner, listed the victim's cause of death as undetermined at the time of the autopsy because he wanted more information. He said the manner of death, whether accidental or homicide, was ultimately a jury question. The victim was twenty-four years old and had a gunshot wound to the right side of her face. The bullet went through the victim's right cheek into her skull and out the back, left side of her head. He said that if the shooter was taller than the victim, the shooter had to shoot from below the victim to create the angle of the wound. He said stippling was found on the victim's face, which helped determine how far the gun was from the skin when it was fired. He requested test patterns of stippling from the gun to determine the distance. He determined the gun was between six and nine inches from the victim's face when it was fired and said it was closer to nine inches.

Dr. Davis testified that it was unlikely the victim fired the gun based on the angle of the wound, the distance between the gun and her face, and the amount of pressure needed to fire the gun but that it was possible the gun was held differently. He said that if the victim held the gun by the slide as the [Petitioner] suggested, her hands would have had lacerations, which were not found. Dr. Davis said that the victim could have moved from the doorway to the sofa after she was shot because she did not have a brain stem injury but that the movement may not have been intentional.

Greg Smith, an insurance agent, testified that the victim had a $23,000 life insurance policy through her employer, which would double to $46,000 if her death was accidental. The victim applied for the insurance, not the [Petitioner]. The beneficiary was the [Petitioner], and he submitted an application to receive the payout in May 2010.

Metro Police Sergeant Pat Postiglione took the blood spatter evidence from the crime scene to Jerry Findley, an expert in Statesboro, Georgia. He took most of the victim's clothes, the [Petitioner's] clothes and shoes, a pair of gloves, photographs, the 9-1-1 call recording, the [Petitioner's] interview recording, and the witnesses' statements. He did not tell Mr. Findley his theory.

Sergeant Postiglione walked with Christine Rogers from her office where the victim was seen at 4:30 p.m. on March 16, 2010, to the employee parking lot where the victim was parked. The walk took two minutes and forty seconds. He drove from Skyline Medical Center to the [Petitioner's] house three times, and the drive took approximately 8 minutes. He said the total time it took the victim to walk to her car and drive home was ten minutes and forty seconds.

Sergeant Postiglione obtained the computer aided dispatch (CAD) system history from the [Petitioner's] patrol car. The CAD history showed that the [Petitioner] went to Megan Prisco's address fourteen times between February 14 and March 7, 2010. He said that the [Petitioner] "self-initiated" eight of the fourteen calls and that four of the eight calls were out of his patrol zone.

Jerry Findley, an expert in bloodstain pattern analysis and crime scene reconstruction, testified that the gun had blood transfer stains and that the paper towel had impact stains and gunshot residue consistent with its being used to hold the gun when it was fired. He said the blood stains on the victim's arm indicated she was holding her arm up when she was shot. The victim's left hand had impact stains on the palm meaning her left hand had to be open and exposed to the source of the blood. He said that if the victim was holding out the gun, she would have had impact stains on the underside of her right arm, which she did not have. The [Petitioner] had impact stains on his nose and around his mouth, which showed that he was facing the victim "direct on" at the time of the gunshot. The [Petitioner] had backspatter on the right side of his shirt, which was blood moving toward the source of the force that caused the injury, the gun. He had "swipe stains" on the left side of his shirt that looked like finger marks. Impact stains appeared on the [Petitioner's] left shoe, which showed the shoe was facing the wound as backspatter returned. The impact stains on the [Petitioner's] face and shoes indicated he was facing the "source of entry" at about a forty-five-degree angle. No blood was found in the other

rooms of the house, although the [Petitioner] said he took the AR-15 to the bedroom after the shooting.

Mr. Findley saw no evidence that the [Petitioner] performed CPR and no blood evidence to support the [Petitioner's] reaching for the AR-15 when the victim was shot. Mr. Findley's findings did not support any of the [Petitioner's] three stories that he was in the kitchen, in the bedroom, or sitting on the couch when the victim was shot. His findings showed that the victim did not fire the gun. He believed the victim was shot somewhere near the front door, grabbed her face, and moved or was moved to the sofa where she remained until emergency personnel arrived.

The [Petitioner] testified that he and the victim met in high school and started flirting when they worked together at Chuck-E-Cheese. He said that in 2004, he graduated from high school and enlisted in the Marines. He deployed overseas in November 2005 for four months and returned to Nashville to visit family in the spring of 2006. When he was in Nashville, he saw the victim at a mall, and they exchanged numbers. They began talking and started a long-distance relationship when he returned to Camp Lejeune, North Carolina. They became engaged on February 14, 2007, and were married in August 2007. The victim did not move to North Carolina with the [Petitioner] but lived with her mother in Nashville. The [Petitioner] and the victim eventually rented an apartment in Nashville where the victim lived alone while the [Petitioner] remained in North Carolina. The [Petitioner] was honorably discharged from the military in May 2008 for a medical disability and was hired by the Metro Police Department in October or November 2008. He entered the police academy, which lasted around six months and ended in July 2009. The [Petitioner] and the victim bought a house in the fall of 2009.

The [Petitioner] testified that he kept "a lot of firearms" in the house, including personal weapons and three police-issued service weapons. He had a gun safe in the master bedroom closet and kept all his weapons secured if he was not home. He said he kept one gun out and around him and the victim if they were home. He said that he carried a gun everywhere, even when he was off duty, and that the victim knew he always carried a gun. He said the victim sometimes carried a gun but did not have a carry permit. He cleaned his guns frequently.

The [Petitioner] testified that he met Megan Prisco when he was working as a police officer and admitted having a texting relationship with

her. He admitted that the majority of their text messages were sexual in nature. He said that flirting was "very normal" for him but that exchanging numbers was not. He agreed that his cell phone records showed he sent text messages to, called, and flirted with women other than his wife. He said he met Paige Merriweather when he responded to a traffic accident. He said that they flirted at the scene, that she gave him her number, and that he told her he was married. He said he deleted the text messages from Ms. Prisco and Ms. Merriweather to prevent the victim's seeing them.

The [Petitioner] admitted that he and the victim had money trouble, were late on their bills, and lived paycheck to paycheck sometimes. He said that he paid the "large" bills like the mortgage, car note, and car insurance and that the victim paid the "smaller" bills like the utilities, cable, and cell phone. They had separate checking accounts. He said that the utility bills were in his name because the victim did not have good credit and that they placed the accounts in his name to avoid paying a deposit.

The [Petitioner] testified that in March 2010 when the victim was in Virginia, he received a $600 "light" bill because the victim had not paid it. He took $400 from the money he had saved for the mortgage and paid the bill to avoid having the electricity turned off. He told the victim that he wanted her to repay him because he needed the money to pay the mortgage. On March 11, 2010, the victim told the [Petitioner] to come to Skyline Medical Center for lunch because she had received her paycheck and would write him a check for the amount she owed. The [Petitioner] was scheduled to work at 2:00 p.m. that day and went to Skyline Medical Center around noon to obtain the money. The victim was busy, could not leave, and kept saying "hold on." The [Petitioner] said the argument overheard by the victim's co-workers concerned the [Petitioner's] having to wait, not money. The [Petitioner] admitted saying to the victim, "I am tired of playing these f games." He stated that he felt bad about what he said after he left, spoke with the victim on the telephone, and apologized for his behavior at her work. He said the victim apologized for hiding the missed payments on the bill. The victim later wrote him a check for $400, and he paid the mortgage.

The [Petitioner] testified that on the day of the shooting, he received a call from a motorcycle shop informing him that his motorcycle was repaired and ready to be picked up. The victim took him to the motorcycle shop on her way to Skyline Medical Center to complete paperwork for a new job in a different department. The [Petitioner] drove the motorcycle

home but did not remember what time he arrived. He said he began watching the movie Training Day and took a couple of guns from the safe, including his Glock 19, which was his favorite sidearm, his first handgun, and the gun he always kept with him. He said he had a "ballistics lab" in the spare bedroom of the house, which was a "trauma plate" taken from the inside of a bulletproof vest and set against a hard surface like old rims or tires. He said he would fire rounds into it from about one foot away. The [Petitioner], the victim, and other visitors fired guns in the house multiple times.

The [Petitioner] said that in his opinion, there were two ways to clean guns, "cleaning the gun" and keeping the gun "inspection ready" as a Marine would. "Inspection ready" meant being able to place a finger inside the gun barrel and remove it with no sign of "carbon buildup" or gunshot residue. He said he used Windex to clean the inside of the gun barrel to make it inspection ready.

The [Petitioner] testified that he cleaned his guns that day. He said that when the victim arrived home that afternoon, he was removing a bullet lodged in the trauma plate. The [Petitioner] would not allow the victim to shoot the gun when she asked because she had accidentally discharged a gun in January or February and guns were "kind of off limits." Regarding the accidental discharge, the [Petitioner] said the victim told him in early 2010 that she accidentally shot a gun and that the bullet lodged in the wall. He said that the incident became a "big joke" but that he stopped leaving out guns for the victim because the accident scared him. The [Petitioner] said, though, that the victim could obtain a gun from the safe and that he could not prevent her from having one.

The [Petitioner] said that after he told the victim that she could not shoot the gun, she stated she wanted the [Petitioner] to teach her more about guns and that they began disassembling the Glock handgun in the living room. He said he could disassemble the gun in less than five seconds. He said the AR-15 was on the ottoman in front of him and the victim. He said the victim asked if he would like "Shake and Bake" chicken for dinner and went to the kitchen to begin cooking. He said that the victim cooked and that he rarely did. He said he sat in the living room watching the movie. He said that the events after the victim began cooking were "not really clear" and that he knew the victim had placed the chicken in the oven but did not know how long it had been cooking. He said he thought they were done with the guns, reloaded the Glock, and placed it on

the ottoman in front of him. He did not know if the victim saw him reload the Glock.

The [Petitioner] testified that when the victim returned to the living room, he told her he would show her how to disassemble the AR-15. He said he reached for the AR-15, heard a shot, and felt the force of the shot. He said the victim was on his left but did not know if she was sitting or standing. When he looked around, the victim was on her side, and he knew she was hurt. He said he called 9-1-1 and performed CPR without moving the victim from the couch. He said that the victim told him to get rags and that he ran to the linen closet. He said that his house alarm sounded when he was on the telephone and that he ran to the alarm keypad and pushed the medical button. He said that when he attempted CPR, air would not go into the victim's body and that he removed a tooth from her mouth and continued CPR. He said that he tried to find his police-issued CPR kit to obtain a better seal during CPR, could not find it, and threw the AR-15 in the gun safe where he kept his police gear.

The [Petitioner] was unable to state exactly what happened in the minutes after the shooting and did not remember what he said to the officers when they arrived at the scene. He said he did not request the Fraternal Order of Police (FOP) attorney who came to the scene and did not remember what he and Chaplain Duke discussed. He signed a consent to search form, allowed the police to take a photograph of him, gave the police his clothes, and went to the police station voluntarily. He said the FOP attorney advised him to not make a statement that night.

The [Petitioner] testified that he did not know if the victim had life insurance. He said he called the victim's employer and the police department's human resources to ask if there was life insurance for the victim because he had to plan her funeral and had no money to pay for it. He went to the police station the day after the shooting to tell the police what happened. He denied shooting his wife.

On cross-examination, the [Petitioner] testified that he and the victim went to a gun range at least three times, talked about gun safety each time, and reviewed gun safety again after the victim's accidental discharge. He said he used the Glock on March 16 to teach the victim more about guns. He said that he was happily married but that he and his wife had problems. He denied saying he would kill the victim and their future child if he had to pay child support. He denied firing a gun at the victim in the

- 13 -

house. He said he had asked the victim for a divorce and had called her a "fat b----" because he was an "a--hole."

The [Petitioner] admitted that he made crude sexual comments to other women while he was with his wife and that he went to the jewelry store where the victim previously worked and asked her if she was "f" two customers who were in the store. The [Petitioner] admitted sending several text messages to Megan Prisco and driving by her house but denied stalking her. He admitted texting Paige Merriweather the night before the victim died. He said that Cherelle Bradford was a friend and agreed that they had sent 408 text messages to each other in three months, that he went to her apartment and stayed late at night, and that she wrote him letters when he was briefly incarcerated.

Metro Police Sergeant Bob Allen taught firearms and defensive tactics at the Metro Police Academy and was familiar with the Glock .40 caliber, a Metro Police standard firearm. He said the .40 caliber Glock was similar to the nine-millimeter Glock. He agreed the nine-millimeter handgun was an "extremely safe" weapon with two internal and one external safeties and said it would not fire if it was dropped or slapped because it had a drop safety and required proper pressure on the trigger to fire. He said that a finger or a hand would be cut if it was on the slide when the gun discharged. He said that a gun could be held several ways to fire and that it was possible to fire a gun without a hand on the slide when it recoiled. He said that if the gun were not held correctly when fired, the shell would not eject properly and that it would not fire again. He said more women than men had trouble gripping the firearm properly.

Michael Maloney, an expert in bloodstain pattern analysis and forensic crime scene reconstruction, testified that he did not believe the blood on the wall by or on the door was from the victim grabbing her face after she was shot and slinging her hand down because the direction of the blood was horizontal, not vertical. He did not believe the blood stains on the floor represented a trail. He said that the [Petitioner's] shirt was within three feet of the shot, probably closer, and that the backspatter came from the left. He was uncomfortable addressing the blood on [the] victim's hands and arms because [he] did not know if it came from the gunshot or was transferred during life-saving measures. He did not think the victim grabbed her wound to block the flow of blood because the palm of her hand was not coated in blood as he would have expected and because blood dripping or flow patterns to the lowest point of her elbow were not seen.

He said the blood spatter on both sides of the victim's hands was not consistent with a defensive posture. He said the victim could not have walked through her own blood and made the shoe print that was found at the scene because she was not wearing shoes. In his opinion, the victim was seated to the [Petitioner's] left on the sectional sofa on the second of three cushions, the [Petitioner] was seated directly to the victim's right leaning forward and reaching toward the ottoman, and the gun was between three and nine inches from the victim's right cheek when it was discharged. He could not determine who controlled the weapon.

Mr. Maloney's findings did not show that the victim was laid on the floor for CPR. He said he would have expected blood on the AR-15 if the [Petitioner] moved it to the closet after the shooting. He considered blood stains on the [Petitioner] suspect because he pulled a hoodie over his face and wiped his hands between the shooting and the photographs but said the blood around the [Petitioner's] mouth and on the tip of his nose was not inconsistent with CPR efforts. He said the evidence did not show that the [Petitioner] was in the kitchen or the bedroom when the shooting occurred.

LeAnne Schaffer, a friend of the [Petitioner] and the victim, testified for the defense that the [Petitioner], the victim, and other friends talked about the victim's accidentally discharging a gun. She said the victim stated that she fired the gun.

Rachel Walker, a friend of the [Petitioner] and the victim, testified that in December 2009, the victim said that she picked up a gun and that it fired, went through her bed, and came out in the living room behind the television. She knew the victim lost her wedding ring because she helped look for it in the house and the yard. She said that she and the victim thought the dog got it.

The jury convicted the Defendant of second degree murder, and he received an eighteen-year sentence.

Id. at *1-12.

The five witnesses testifying at the evidentiary hearing were the Petitioner, trial counsel who also represented the Petitioner on direct appeal ("counsel"), and three witnesses, Patrick Walker, Michael Morris, and Sierra LeeAnn Schaffer, supporting the petition for post-conviction relief. We will set out synopses of their testimony.

The Petitioner testified that while counsel was cross-examining Chaplain James Duke of the Metro Nashville Police Department, counsel elicited prejudicial hearsay from the witness. According to the Petitioner, counsel asked Chaplain Duke what the victim's mother, Charlotte Barbour, had said to the Petitioner after learning of her daughter's death. Chaplain Duke said that Ms. Barbour responded by saying she had warned the Petitioner about all of his guns and that he had "finally killed [the victim]." Ms. Barbour showed Chaplain Duke a photograph of the victim, saying, "[L]ook what [the Petitioner] took from me." The Petitioner alleges that counsel was ineffective by allowing this testimony to be heard during his cross-examination of the witness.

As to the testimony of Stephanie Lindblom, the Petitioner testified that counsel was ineffective by introducing victim's emails because "he made an attempt to highlight how [the victim] may have communicated in the flippant type style of comments that she had made in her emails." He then explained that the victim's email saying, "Don't leave me up here with this nut," was not the way the victim communicated and "helped to establish that [the victim] was potentially afraid during the argument and the email was really about [the Petitioner]." The Petitioner alleged that counsel used the email "without fully vetting it" and, thus, was ineffective as to this matter.

The Petitioner continued his testimony by saying that counsel had not understood how a Glock handgun worked, as evidenced by his cross-examination. He said that counsel had tried to show, using the Glock pistol, how it would have been possible for the victim to have shot herself. However, according to the Petitioner, counsel had made a mistake by instructing the medical examiner, Dr. John Davis, to place his finger over the slide of the pistol. The Petitioner said he informed counsel of this error, but he was ignored. On redirect examination, the State asked Dr. Davis to hold the pistol as counsel had asked him to do, and the witness said holding the pistol in that way would have resulted in an injury to the finger of the person holding it. All of this, the Petitioner claimed, was another "blunder" by counsel. He added that the mistake was compounded by the testimony of defense witness, Sergeant Bob Allen, a firearms instructor, who said that the grooves in the slide of the pistol could cut a person's hand when the gun discharged. The Petitioner said that the demonstration was also argued by the State during closing arguments.

Further, the Petitioner argued that counsel was ineffective during the cross-examination of Sergeant Pat Postiglione, through whom the State "introduced a theory" that "maybe [the Petitioner] had put the chicken in [the oven] prior to [the victim's] arriving home from work." In the Petitioner's view, such questions made it "appear like [the Petitioner] had this all planned out and premeditated."

The Petitioner argued that, to counter the State's theory that he and the victim had a troubled marriage, counsel should have presented witnesses, particularly Doug Belcher, LeeAnn Schaffer, Michael Morris, and Patrick Walker. Prior to the trial, counsel told the Petitioner that he was going to call some of these witnesses. Counsel later told the Petitioner that testimony from these witnesses "would open the door for . . . other stuff to come in." However, the Petitioner said this was "irrelevant" to him because "the door ha[d] already been open[ed]."

As for the Petitioner's accusing the victim at the jewelry store where she formerly worked of "having sex with random men in the store and stuff like that," the Petitioner explained that he actually had been referring to a homosexual ex-boyfriend of the victim and joked that the victim had turned him "gay completely." The Petitioner could have explained the situation if counsel had reexamined him at trial.

The Petitioner further complained about how counsel handled the issues of there being no fingerprints on the pistol or blood in the bedroom. As for the fingerprints, the Petitioner said counsel should have asked the crime scene investigators to explain that it was very difficult to get fingerprints off the Glock in order to discredit the State's position that the Petitioner had wiped off the fingerprints. Regarding the lack of blood in the bedroom, the Petitioner said that he had received in pretrial discovery two audio files, one of a 911 telephone call made by his alarm company saying that a medical alert button had been pushed at his address. The Petitioner said that he had pushed the alert button on the bedroom keypad, proving that he did go into the bedroom.

Regarding performing CPR on the victim, the Petitioner said that he first had to remove a tooth from her throat to clear the airway. A photograph introduced by the State showed this tooth on the couch. According to the Petitioner, counsel failed to emphasize the fact that there had been a tooth on the couch to rebut the testimony of the State's expert, Jerry Findley, that he did not see any evidence of the Petitioner's having performed CPR on the victim.

In his statement to police officers, the Petitioner said that he had been cleaning his rifle and pistol, using Windex and a paper towel, which was photographed wrapped around the pistol. The State's theory was that the Petitioner had wrapped the paper towel around the pistol before he shot the victim so that his fingerprints would not be on the gun. However, counsel did not talk about the pistol because it was not consistent with the defense's theory. In the Petitioner's view, counsel did not "bring up . . . the simple fact that it is almost commonsense of what happened was [the Petitioner] told [police officers] [he] was cleaning guns," which was proven by the Windex bottle, paper towel, and pistol.

- 17 -

The Petitioner explained that, while "[p]hotos of everywhere were pretty much introduced," counsel did not properly utilize them to defend the Petitioner. Apparently, the basis for this contention is that the State's theory was that the victim had not been at the residence long enough to start cooking dinner by putting the chicken in the oven. The Petitioner said that counsel should have emphasized that the crime scene photographs showed the victim's keys were on the kitchen table, her sweater was over the back of the couch, and her shoes were off. According to the Petitioner, as the trial was proceeding, he was "kind of like, you know, hey, bring this up, you know, kind of whispering in [counsel's] ear and whatnot or then even after the fact to even, even bring it up maybe in his closing argument."

The Petitioner also complained about counsel's questioning of Ms. Barbour. As we understand this claim, Ms. Barbour related that she asked the victim if she had fired a shot near the foot of the bed, which the victim denied, but Ms. Barbour testified that the shot hit the wall near the Petitioner's head. The Petitioner had earlier advised counsel that Ms. Barbour "was going to lie about certain things," but counsel did not respond.

Further, counsel was ineffective in his handling of the appeal. In the Petitioner's view, "about 40 percent of the issues that were raised on appeal . . . were all good issues that were waived by the Court of Criminal Appeals due to [counsel's] failures during and after the trial."

Next, the Petitioner said that counsel erred during opening statements when he referred to the Petitioner as cocky, arrogant, and immature, as well as being "a pervert [and] a flirt." These words were repeated during closing arguments by the State. In the Petitioner's view, these statements by counsel prejudiced him.

The Petitioner further said that he was prejudiced by the State's misquoting prior testimony as the trial proceeded. As an example, he cited the testimony of Megan Prisco, an employee at a BP station with whom the Petitioner was "involved in a texting relationship." Her trial testimony was incorrectly recalled by the State as being that the Petitioner had told her that he had "a lot of stress in [his] marriage . . . and [he was] going to take care of it." As the State was incorrectly recounting the testimony, counsel "did nothing." According to the Petitioner, he was "kicking [counsel's] leg, like, hey, do something and [counsel] did nothing."

The Petitioner complained that counsel was ineffective for not objecting to the testimony of the victim's mother that the victim had told her that "he would kill [the victim], the baby and himself before he would pay child support." Apparently, counsel filed a motion in limine to keep the jury from hearing this statement, but he never received a final ruling as to its admissibility. Counsel was ineffective in that he did not

object to the State's later misquoting this statement during closing arguments. Further, counsel was ineffective in misquoting the testimony of Dr. Davis as to whether the victim could have held the pistol in the manner that the Petitioner claimed she had. Counsel did not object to this misstatement, the Petitioner asserts.

Counsel testified that he had been practicing law since 1993, with criminal defense work currently comprising about 95% of his practice. He said that he and co-counsel represented the Petitioner at trial and that he was appointed to represent the Petitioner on appeal. He felt that he and the Petitioner communicated well before trial, as they usually met at his law office. The Petitioner alleged that counsel had been ineffective in dealing with misstatements of facts in the State's closing arguments. As to this, counsel replied that he did not object to the State's closing arguments because "that was going to draw more attention to what [the State] was saying and . . . and the jury is already given an instruction that closing arguments are just argument and to base their verdict on the facts." Counsel continued that some of the objectionable statements "crossed back into waters that the [c]ourt told him he couldn't," so these were protected for appeal while others were not because counsel did not object.

Counsel testified that he filed a motion to exclude Chaplain Duke's testimony, alleging it was confidential, but the trial court denied the motion. Counsel believed that statements by the victim's mother were admissible as excited utterances. Further, he believed that the statements of the victim's mother helped the Petitioner because she had blamed him without knowing any of the facts. One of the thrusts of the defense was that the police initially had blamed the Petitioner and, then, "went backwards to try to build a case around him."

Regarding the Petitioner's claim that counsel was ineffective in presenting the demonstration by Dr. Davis as to how the victim might have shot herself, counsel said that, prior to trial, he had met with Dr. Davis and discussed the "proximity of the gun relating to the stippling on the victim, the angle of the wound, and how [the victim] would have had to have held the gun for that to happen." Counsel said he asked Dr. Davis if the victim could have picked up the gun and "had her thumb in the trigger area and it went off." Using a fake gun, Dr. Davis demonstrated how the victim could have held the pistol in this fashion, showing how the victim could have more easily held the gun and corroborated his testimony regarding the stippling and the angle of the wound and backed up the theory that the victim had picked up the gun incorrectly, and it accidently discharged. As for whether holding the gun in this fashion would have cut the victim's hand, counsel said he discussed this possibility with the Petitioner, as well as with their blood spatter expert. Counsel still believed it was better not to ask Dr. Davis about this but simply make the assertion in closing arguments that the gun would have discharged if the victim held it incorrectly.

The State's theory was that, after the victim was shot, the Petitioner put the chicken in the oven. Counsel said this theory made no sense because there was no blood in the kitchen, and the Petitioner was a "bloody mess" after administering first aid to the victim. Counsel said that the State presented several witnesses who testified as to whether the chicken was cooked or uncooked, but he did not know if the State's theory was that the Petitioner put the chicken in the oven before the victim arrived or after he had killed her.

Counsel testified that, in his opening statement, he had said that the Petitioner was "cocky, arrogant, immature, irresponsible around weapons" and that, as to this statement, "[t]he truth hurts." Counsel said he would not have told the jury that the Petitioner was a "pervert and a flirt" if his motion in limine had been granted. Counsel said that his "plan was not to run away from things that you know are going to hurt you, because that makes you look dishonest to the jury." Counsel said that the Petitioner gave him a list of witnesses who would rebut the State's theory that the Petitioner and victim's marriage was troubled. However, counsel believed that the witnesses the Petitioner wanted to testify would have opened the door for evidence of bad character if they had been put on the stand. As for the statement in this court's opinion on direct appeal that the Petitioner had waived the issue, counsel said that, in fact, he filed a motion in limine as to this evidence, which the trial court granted.

Counsel testified that he filed a motion to exclude the testimony of Officer Peebles regarding the Petitioner's committing domestic verbal abuse, but the motion was denied. Counsel said he made a mistake by not raising the issue in the motion for new trial. Paige Merriweather's testimony about her relationship with the Petitioner was the subject of an unsuccessful motion in limine. Counsel believed that this matter should have been raised in the motion for new trial. Counsel further said that the admissibility of the testimony of Megan Evans regarding the incident at the jewelry store was the subject of another unsuccessful motion in limine and that the denial of the motion should have been raised in the motion for new trial. Counsel said he should not have waited until closing arguments to illustrate that the victim could have accidently shot herself by having her thumb on the trigger mechanism as she held the pistol. Also, it was "probably" a mistake to put the Petitioner on the witness stand, although counsel did not anticipate that the Petitioner would testify "that he didn't recall a lot of what happened." Although the State offered to allow the Petitioner to plead guilty to second degree murder, he did not wish to do so.

Counsel retained an investigator, a former police officer, who participated in the pretrial preparation and sat with counsel during the trial. Counsel did not object to certain statements during the State's closing argument because he believed it would harm his likeability with the jury and underscore exactly what the State had argued. Counsel

asserted in his closing argument that the State and the victim's family had rushed to judgment in the matter. The statement by the victim's mother that she thought the Petitioner had killed the victim bolstered this argument. Counsel knew that the statement of Stephanie Lindblom would be admitted at trial, and, as part of his strategy, he questioned her about the victim's email.

Prior to trial, counsel talked to Dr. John Davis because it was important to the defense strategy that Dr. Davis had ruled the victim's death was inconclusive as to whether it was a murder or suicide. Counsel discussed with Dr. Davis regarding the proximity of the weapon to the victim's face, whether there was gunshot residue on her hands, and the angle of the weapon. Dr. Davis said the lack of gunshot residue on the victim's hands was not important because it was not always found on the hands of a person who had fired a weapon. The defense blood spatter expert testified it would have been difficult for the victim to hold the pistol correctly and shoot herself, but she could have done so if she had her thumb in the chamber and the discharge was accidental.

## ANALYSIS

We will review the ineffective assistance of counsel claims made by the Petitioner, the responses of counsel, and the findings made by the post-conviction court.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

- 21 -

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In our review, we will follow the order in which the post-conviction court reviewed the complaints raised by the Petitioner.

## I. Ineffective Assistance of Counsel at Trial

Although the Petitioner was represented by the same counsel at trial and on appeal, we are reviewing separately his complaints regarding the trial and those directed to the appeal.

## A. Misstatements of Facts in State's Closing Argument

- 22 -

The Petitioner alleges that counsel failed to object to misstatements made by the State during closing arguments, particularly as to Charlotte Barbour and Megan Prisco. Counsel responded that he did not object to these statements because, by doing so, he would have brought the jury's attention to them. The post-conviction court concluded that counsel made a strategic choice in this regard, which the court would not second-guess. The record supports this determination.

### B. Cross-Examination of Chaplain Duke

At the evidentiary hearing, counsel testified that he questioned Chaplain Duke about the statements made by the victim's mother to bolster his defense that the police made a rushed judgment that the Petitioner had killed the victim. The post-conviction court found that this line of questioning was a "reasonable tactical decision," which the court would not second-guess. The record supports this determination.

### C. Cross-Examination of Stephanie Lindblom

The Petitioner complained that counsel was ineffective as to this witness because counsel introduced an email which harmed the defense, as did certain testimony of the witness. The post-conviction court found that counsel made a reasonable tactical decision in this regard. The record supports this determination.

### D. Cross-Examination of Dr. John Davis

As to Dr. Davis, the Petitioner makes a similar claim, that counsel was ineffective in his cross-examination of the witness. In his questioning of Dr. Davis during the trial, counsel proceeded based upon an apparent misunderstanding of the Petitioner's view of how the victim had been holding the Glock pistol when the fatal shot was fired and, while demonstrating, counsel made a mistake in the way he told Dr. Davis to hold the gun and counsel did not fix the mistake after the Petitioner advised counsel of the mistake. As the post-conviction court pointed out, counsel testified that, prior to the trial, counsel had conversations both with the Petitioner and their blood spatter expert, and neither said that he had a misunderstanding of how the Glock should have been held. Accordingly, the post-conviction court found that counsel was not ineffective as to this claim. The record supports this determination.

### E. Chicken in the Oven

As to this claim, the Petitioner argues that counsel "introduced the theory that the Petitioner might have put the chicken in the oven when he cross-examined Sergeant Postiglione." However, the post-conviction court noted that there "was unquestionably a

chicken found in the oven, and the State presented strong evidence that indicated that [the victim] could not have been home for more than a few minutes before the shooting occurred." The court concluded that counsel made a reasonable tactical decision in asking this question. The record supports this determination.

## F. Opening Statement

The Petitioner asserts that counsel was ineffective in his opening statement by describing the Petitioner as "cocky, arrogant, immature, irresponsible around weapons, a flirt, and a pervert." At the evidentiary hearing, counsel testified that he believed to maintain credibility with the jury he should, himself, tell the jury of the Petitioner's character flaws which would come up during the trial. The post-conviction court concluded that this strategy was a reasonable tactical decision. The record supports this determination.

## G. Counsel's Decision Not to Call Certain Witnesses

The Petitioner asserted that, as the post-conviction court described, "[counsel] was ineffective because he failed to call witnesses to potentially rebut the State's proof that he was not a good husband and that his marriage was in trouble." The post-conviction court observed that, at the hearing, the Petitioner called to testify Patrick Walker, Michael Morris, and LeeAnn Schaffer, all of whom made "nice impressions." However, the court noted that counsel testified at the evidentiary hearing that he "believed that introducing such [testimony] would have opened the door for the State to introduce much more unfavorable evidence." The post-conviction court recalled that, prior to trial, counsel was successful with motions in limine to exclude character evidence which would have been harmful to the Petitioner. Introducing the evidence which the Petitioner argues counsel should have done could have opened the door to previously excluded evidence. In this regard, the post-conviction court explained that "the Petitioner ignores the fact that there was still additional evidence that had been excluded that might have become admissible had [counsel] put on additional evidence about the Petitioner's character and the overall history of his marriage to the victim." The post-conviction court concluded that counsel made a correct decision by not putting into evidence the claims the Petitioner believes he should have. Accordingly, counsel was not ineffective as to this decision. The record supports this determination.

## H. Cross-Examination Regarding Lack of Fingerprints on Glock Pistol

The Petitioner claims that counsel was ineffective in his cross-examination as to whether the grip of a Glock pistol could hold fingerprints. According to the post-conviction court, the State's theory at trial was that the Petitioner had wiped his

fingerprints off the handle of the pistol. At the hearing, counsel testified that he did not question witnesses in this regard because "he believed that it was more beneficial to the Petitioner's case that [the Petitioner's] fingerprints were not on the gun" than it would have been to possibly refute the State's theory that the Petitioner wiped the fingerprints off the gun. The trial court determined that this was a tactical decision, and the record supports this determination.

## I. Trial Tactics Regarding Paper Towel and Windex

The Petitioner alleges that counsel was ineffective because he did not "adequately explore the possibility that the paper towel could have been near the gun because the Petitioner was in the process of cleaning the gun." The post-conviction court explained that although counsel was not questioned about this at the hearing, he did, at the trial, "cross-examine several of the State's witnesses regarding the paper towel and Windex as possibly being tools used to clean weapons." As for why counsel did not question the Petitioner as to the use of the items, the court observed that ethical considerations might have prevented his doing so. The court concluded that, while such additional questioning might have been prudent, the fact counsel had not done so did not amount to ineffective assistance of counsel. Further, the court concluded that, even if counsel had been ineffective in this regard, the Petitioner failed to prove that he had been prejudiced thereby. The record supports both of these determinations.

## J. Failure to Emphasize that the Victim was Planning to Remain at Home

The Petitioner argues that counsel was ineffective, as described by the post-conviction court,

"because he failed to point out in the cross-examination of any witnesses [sic] that the victim's car keys were on the kitchen table, that her sweater was on the couch, and that she had taken her shoes off, which tended to corroborate [the Petitioner's] narrative that the victim was home for the evening and staying in for dinner, while contradicting a theory the State had offered that the victim was just stopping by the house momentarily."

As to this claim, the post-conviction court noted that counsel and the State both had "elicited" the fact that the victim's keys were on a table, and counsel had elicited, during the cross-examination of Michael Maloney, that the victim was not wearing any shoes. The Petitioner asserts that counsel should have argued these facts in his closing argument. However, the post-conviction court explained that "[t]he Court is not inclined to begin holding that a defense attorney's failure to highlight every single piece of evidence that is arguably favorable to the defense constitutes a deficient performance."

Accordingly, the post-conviction court concluded that the Petitioner had not established a reasonable probability that the outcome would have been different had counsel made these arguments in his closing. The record supports this determination.

### K. Counsel's Dealing with the Tooth on the Sofa

Additionally, the Petitioner argues that counsel was ineffective for not, as the post-conviction court described, "emphasiz[ing] that a tooth was found on the couch as proof that the Petitioner did in fact try to perform CPR on the victim." However, the post-conviction court noted that the placement of the tooth had been used by counsel in his cross-examination of the State's witnesses, Officer Felicia Evans and Dr. John Davis. Further, the Petitioner himself made this claim as he was being cross-examined by the State. The post-conviction court concluded that it was a tactical decision by counsel whether to highlight a point, such as the existence and placement of the tooth, during final argument. The post-conviction court determined that the argument was meritless, and the record supports this determination.

### L. Cross-Examination of the Victim's Mother

The Petitioner's next claim is that counsel did not cross-examine Ms. Barbour about her testimony that the victim had said she was not responsible for the bullet hole in the bedroom. The post-conviction court noted that counsel was not questioned at the evidentiary hearing as to why he had not raised this point during his cross-examination. However, the post-conviction court observed that "not accusing Ms. Barbour, the mother of the victim, of lying on the stand, was a reasonable tactical decision." The record supports this determination.

### M. Cumulative Effect of Errors

Finally, as to his claims of ineffective counsel at trial, the Petitioner alleges that the cumulative effect of counsel's representation amounted to ineffective assistance. The post-conviction court noted two of the Petitioner's claims on which the court based its decision. These two alleged deficiencies were counsel's cross-examination of Dr. Davis regarding the victim's handling of the firearm and not introducing evidence of the 911 telephone call made by the alarm company. However, the post-conviction court noted that the Petitioner had not shown that he was prejudiced by either of these actions. The record supports this determination.

### N. Prosecutorial Misconduct

As to his claim of prosecutorial misconduct, the Petitioner points to the actions of the State and not of trial counsel. In the Petitioner's view, the State made an improper closing argument by attributing a statement to Megan Prisco regarding the state of the Petitioner's marriage to the victim that she had not said. He casts this complaint as a misconduct claim against the State rather than ineffective assistance of counsel. However, this claim is without merit because it should have been raised in the direct appeal rather than in a petition for post-conviction relief.

## II. Ineffective Assistance at Appellate Level

As to this issue, the Petitioner points to several alleged mistakes made by counsel in failing to preserve issues for appeal.

### A. Bullet Hole in the Bedroom

First, the Petitioner asserts that counsel should have questioned in his motion for new trial whether the victim's statement was admissible that she was not responsible for the bullet hole in the bedroom and whether a jury instruction should have been given as to it. On appeal, this court ruled that the issue had been waived because it was not included in the motion for new trial. Deon Lamont Cartmell, 2014 WL 3056164, at *16. As to this claim, the post-conviction court found that the Petitioner had failed to show that he had been prejudiced by the fact that the matter was not raised in the motion for new trial. The court explained what had occurred at trial in this regard:

> Prior to the presentation of this particular evidence, the State had introduced a recorded interview of the Petitioner into evidence. In that interview, the Petitioner spoke of [the victim's] telling him about an accidental discharge of a firearm she had experienced that had left a bullet hole by their bed. The State subsequently introduced the testimony of Ms. Charlotte Barbour that [the victim] had told her that the bullet hole that was supposedly the result of the accidental discharge was not caused by her, but by the Petitioner.

The post-conviction court further explained that counsel requested a limited instruction after this testimony came into evidence. While the court did not give an instruction at that time, it did instruct the jury at the end of the trial that a witness may be impeached by a prior inconsistent statement but that the jury could consider such statement only for purposes of impeachment. As to this matter, the post-conviction court concluded that the Petitioner had failed to show that he was prejudiced thereby. The record supports this determination.

### B.  Testimony of Victim's Mother Regarding Victim's Wedding Ring

The Petitioner argues that counsel was ineffective for not preserving for appeal whether the victim's mother should have been allowed to testify that the victim's wedding ring was missing.  As to this claim, the post-conviction court explained that, prior to trial, counsel had filed a motion to prevent the victim's mother from testifying that, when she asked about the victim's wedding ring, the victim had replied to her, "Don't go there, just leave it alone."  However, because the State advised that it was not planning to introduce this testimony, the trial court did not rule on its admissibility.  At trial, the State elicited from the victim's mother that she had noticed that the victim had not been wearing her wedding ring.  As the post-conviction court noted, this statement "was not the actual hearsay testimony, but simply M[s.] Barbour's personal observation." The record supports this determination.

### C.  Testimony of Officer Peebles Regarding Domestic Verbal Abuse by Petitioner

The Petitioner argues that counsel was ineffective for not preserving for appeal the issue regarding Officer Peebles' testimony regarding the Petitioner's infliction of domestic verbal abuse on the victim.  On appeal, this court concluded that this issue was waived because counsel neither filed a pretrial motion to exclude this testimony nor raised the issue in the motion for new trial.  Deon Lamont Cartmell, 2014 WL 3056164, at *20.  The post-conviction court explained that this court affirmed the determination of the trial court that this testimony was admissible.  Further, the post-conviction court noted that other witnesses' testimony supported Officer Peebles' statements.  As to this issue, the post-conviction court concluded that the Petitioner had failed to show that he was prejudiced by this testimony.  The record supports this determination.

### D. Petitioner's Text Messages to Paige Merriweather

Because counsel did not object to the introduction of text messages sent by the Petitioner to Paige Merriweather, this court concluded that the issue had been waived for the appeal.  Additionally, this court noted on appeal that the Petitioner likely had opened the door to this evidence by his testimony regarding Ms. Merriweather.  Deon Lamont Cartmell, 2014 WL 3056164, at *28.  Thus, the post-conviction court concluded that the Petitioner had failed to show that he had been prejudiced by the fact that counsel did not object to the introduction of this evidence, and the record supports this determination.

### E. Testimony of Megan Evans Regarding Incident at Store

As the post-conviction court explained, Ms. Evans apparently told investigators before trial that the victim had told her, several years earlier, that the Petitioner had held a

pistol to her head and said "POW." However, the court noted that Ms. Evans did not testify before the jury, and, thus, the Petitioner had failed to show that counsel was ineffective for not preserving for appeal the admissibility of Ms. Evans' intended testimony. The record supports this determination.

### F.  Cumulative Error

The Petitioner argues that the cumulative effect of counsel's alleged errors amounted to ineffective assistance. As to this claim, the post-conviction court held that the Petitioner had failed to establish that he was prejudiced by any of the alleged errors. The record supports this determination.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE